Wiley L. BOLDEN et al., Plaintiffs,

v.

CITY OF MOBILE, ALABAMA, et al., Defendants.

Civ. A. No. 75–297–P.

United States District Court,
S. D. Alabama, S. D.

Oct. 21, 1976.

As Amended Oct. 28, 1976.

J. U. Blacksher, Larry Menefee and Gregory B. Stein, Mobile, Ala., Edward Still, Birmingham, Ala., Jack Greenberg, James M. Nabrit, III, and Charles E. Williams, III, New York City, for plaintiffs.

C. B. Arendall, Jr. and David A. Bagwell, S. R. Sheppard, City of Mobile Legal Department, Mobile, Ala., for defendants.

## OPINION AND ORDER

PITTMAN, Chief Judge.

This action is brought by Wiley L. Bolden and other black plaintiffs representing all Mobile, Alabama, blacks as a class, claiming the present at-large system of electing city commissioners abridges the rights of the city's black citizens under the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution of the United States; under the Civil Rights Act of 1871, 42 U.S.C. § 1983; and under the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, et seq.

Plaintiffs alleged that the existing commission form of government elected at-large ". . . discriminates against black residents of Mobile in that their concentrated voting strength is diluted and canceled out by the white majority in the City as a whole" with a consequent violation of their rights under the above Amendments to the Constitution. It is also claimed that their statutory rights under 42 U.S.C. §§ 1973, et seq. [Voting Rights Act of 1965] and 1983 [Civil Rights Act of 1871] were violated. Jurisdiction is premised upon 28 U.S.C. § 1343(3) and (4).

This court has jurisdiction over the claims based on 42 U.S.C. § 1983 against the City Commissioners and over the claims grounded on 42 U.S.C. § 1973 against all defendants under 28 U.S.C. § 1343(3)–(4) and § 2201.

This cause was certified as a class action under Rule 23(b)(2), F.R.C.P., the plaintiff class being all black persons who are now citizens of the City of Mobile, Alabama.

A claim originally asserted under 42 U.S.C. § 1985(3) was dismissed for failure to state a claim upon which relief can be granted.

Defendants are the three Mobile City Commissioners, sued in both their individual and official capacities.

The prayed-for relief consists of, (1) a declaration that the present at-large election system is unconstitutional, (2) an injunction preventing the present commissioners from holding, supervising, or certifying any future city commission elections, (3) the formation of a government whose legislative members are elected from single member districts, and (4) costs and attorney fees.

Plaintiffs claim that to prevail they must prove to this court's satisfaction the existence of the elements probative of voter dilution as set forth by *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) (en banc), aff'd. *sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), contending *Zimmer* is

only the adoption of specified criteria by the Fifth Circuit of the *White* dilution requirements.

The defendants stoutly contest the claim of unconstitutionality of the city government as measured by *White* and *Zimmer*. They contend *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), erects a barrier since the 1911 legislative act forming the multi-member, at-large election of the commissioners was without racial intent or purpose. They assert *Washington, supra*, 96 S.Ct. at 2047–49, which was an action alleging due process and equal protection violations, held that in these constitutional actions, in order to obtain relief, proof of *intent* or *purpose* to discriminate by the defendants must be shown. Defendants state, therefore, that since the statute under which the Mobile Commission government operates was passed in 1911, with essentially all blacks disenfranchised from the electorate by the Alabama 1901 constitution, there could be no intent or purpose to discriminate at the time the statute was passed. Alternatively, however, defendants contend that if *Washington* does not preclude consideration of the dilution factors of *White* and *Zimmer*, they should still prevail because plaintiffs have not sustained their burden of proof under these and subsequent cases.

Plaintiffs' reply is to the effect that *Washington* did not establish any new constitutional purpose principle and that *White* and *Zimmer* still are applicable. If, however, this court finds *Washington* to require a showing of racial motivation at the time of passage, or merely in the retention of the statute, plaintiffs contend they should still prevail, claiming the at-large election system was designed and is utilized with the motive or purpose of diluting the black vote. Plaintiffs claim that the discriminatory intent can be shown under the traditional tort standard.

1. Defendants' Exhibit No. 12. According to the 1970 Federal Census, the City of Mobile had a total population of 190,026 of whom 35.4% or 67,356, were non-white. The evidence is clear

## FINDINGS OF FACT

Mobile, Alabama, is the second largest city in Alabama located at the confluence of the Mobile River and Mobile Bay in the southwestern part of the state. Mobile's 1970 population was 190,026 with approximately 35.4% of the residents black.[1] 1973 Mobile County voters statistics estimate that 89.6% of the voting age white population is registered to vote, 63.4% of the blacks are registered. (Plaintiffs' Exhibit No. 7).

Mobile geographically encompasses 142 square miles. Most of the white residents live in the southern and western parts of the city, while most blacks live in the central and northern sectors (Plaintiffs' Exhibit No. 58). Housing patterns have been, and remain, highly segregated. Certain areas of the city are almost totally devoid of black residents while other areas are virtually all black. In a recent study by the Council on Municipal Performance, using 1970 block census data, Mobile was found to be the 95th most residentially segregated of the 109 municipalities surveyed (Plaintiffs' Exhibit No. 59). According to a study performed by the University of South Alabama Computer Center for the defendants, the housing patterns in the city are so segregated it is impossible to divide the city into three contiguous zones of equal population without having at least one predominantly black district (Plaintiffs' Exhibit No. 60). Segregated housing patterns have resulted in concentration of black voting power.

Mobile presently operates under a three person commission-type municipal government adopted in 1911. (Ala. Act No. 281 (1911) at 330). The commissioners are elected to direct one of the following three municipal departments: Public Works and Services, Public Safety, and Department of Finance.[2]

The commissioners run on a place-type ballot and are elected at-large by the voters

that there are few non-whites other than blacks.

2. When adopted in 1911, Mobile's commission government did not specify that a candidate

of Mobile. While the commission candidates must be residents of Mobile, there is not now, or has there ever been, a requirement that each commissioner reside in a particular part of the city. The evidence clearly indicates that district residence requirements with district elections would be improvident and unsound for the commission form of government.

In addition to the specific position for which a commissioner runs, each is also responsible for numerous appointments to the 46 committees operating under the auspices of the city. Some appointments are completely discretionary with the commissioner whereas committees, such as the plumbing and air conditioning boards which require members with a certain amount of expertise, are filled with a nominee suggested by the local trade association. Often, the appointing commissioner makes his appointment from the slate of nominees presented by the particular association. This means that if the nominating association does not propose a black as a committee member, the commissioner will not appoint one. It is, however, within the commission's power to modify or change the ground rules under which appointments are made.

In *Zimmer, supra,* aff'd. *sub nom. East Carroll Parish School Board, supra* (". but without approval of the constitutional views expressed by the Court of Appeals."), the Fifth Circuit synthesized the *White* opinion with the Supreme Court's earlier *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), decision, together with its own opinion in *Lipscombe v. Jonsson,* 459 F.2d 335 (5th Cir. 1972) and set out certain factors to be considered.

Based on these factors as set out in *Zimmer, supra,* at 1305, the court makes the following findings with reference to each of the primary and enhancing factors:

## LACK OF OPENNESS IN THE SLATING PROCESS OR CANDIDATE SELECTION PROCESS TO BLACKS

Mobile blacks were subjected to massive official and private racial discrimination until the Voting Rights Act of 1965. It has only been since that time that significant diminution of these discriminatory practices has been made. The overt forms of many of the rights now exercised by all Mobile citizens were secured through federal court orders together with a moral commitment of many of its dedicated white and black citizens plus the power generated by the restoration of the right to vote which substantially increased the voting power of the blacks. Public facilities are open to all persons. Job opportunities are being opened, but the highly visible job placements in the private sector appear to lead job placements in the city government sector. The pervasive effects of past discrimination still substantially affects political black participation.

There are no formal prohibitions against blacks seeking office in Mobile.[3] Since the Voting Rights Act of 1965, blacks register and vote without hindrance. The election of the city commissioners is non-partisan, i. e., there is no preceding party primary and the candidates do not ordinarily run under party labels. However, the court has a duty to look deeper rather than rely on surface appearance to determine if there is true openness in the process and determine whether the processes "leading to nomination and election [are] . . . equally open to participation by the group in question . . . ." *White,* 412 U.S. at 766, 93 S.Ct. at 2339. One indication that local political processes are not equally open is

must choose the particular commission position for which he was running. Alabama Act No. 823 (1965) at 1539, however, *inter alia,* required candidates to run for a particular numbered position with specific duties. Each commissioner holds that position during the four years tenure with the mayorality rotating between commissioners every sixteen months.

3. The qualifying fee for candidates for the city commission was found unconstitutional in *Thomas v. Mims,* 317 F.Supp. 179 (S.D.Ala. 1970). *See also U. S. v. State of Ala.,* 252 F.Supp. 95 (M.D.Ala.1966) (three judge District Court panel) (poll tax declared unconstitutional).

the fact that no black person has ever been elected to the at-large city commission office. This is true although the black population level is in excess of one-third.

In the 1960's and 1970's there has been general polarization in the white and black voting. The polarization has occurred with white voting for white and black for black if a white is opposed to a black, or if the race is between two white candidates and one candidate is identified with a favorable vote in the black wards, or identified with sponsoring particularized black needs. When this occurs, a white backlash occurs which usually results in the defeat of the black candidate or the white candidate identified with the blacks.

Since 1962, four black candidates have sought election in the at-large county school board election. Dr. Goode in 1962, Dr. Russell in 1966, Ms. Jacobs in 1970, and Ms. Gill in 1974. All of these black candidates were well educated and highly respected members of the black community. They all received good support from the black voters and virtually no support from whites. They all lost to white opponents in run-off elections.

Three black candidates entered the race of the Mobile City Commission in 1973. Ollie Lee Taylor, Alfonso Smith, and Lula Albert. They received modest support from the black community and virtually no support from the white community. They were young, inexperienced, and mounted extremely limited campaigns.

Two black candidates sought election to the Alabama State Legislature in an at-large election in 1969. They were Clarence Montgomery and T. C. Bell. Both were well supported from the black community and both lost to white opponents.

Following a three-judge federal court order in 1972[4] in which single-member districts were established and the state house and senate seats reapportioned, one senatorial district in Mobile County had an almost equal division between the black and white population. A black and white were in the run-off. The white won by 300 votes. There was no overt acts of racism. Both candidates testified or asserted each appealed to both races. It is interesting to note that the white winner published a simulated newspaper with both candidate's photographs appearing on the front page, one under the other, one white, one black.

One city commissioner, Joseph N. Langan, who served from 1953 to 1969, had been elected and reelected with black support until the 1965 Voting Rights Act enfranchised large numbers of blacks. His reelection campaign in 1969 foundered mainly because of the fact of the backlash from the black support and his identification with attempting to meet the particularized needs of the black people of the city. He was again defeated in an at-large county commission race in 1972. Again the backlash because of the black support substantially contributed to his defeat.

In 1969, a black got in a run-off against a white in an at-large legislature race. There was an agreement between various white prospective candidates not to run or place an opponent against the white in the run-off so as not to splinter the white vote. The white won and the black lost.

Practically all active candidates for public office testified it is highly unlikely that anytime in the foreseeable future, under the at-large system, that a black can be elected against a white. Most of them agreed that racial polarization was the basic reason. The plaintiffs introduced statistical analyses known as "regression analysis" which supported this view. Regression analysis is a professionally accepted method of analyzing data to determine the extent of correlation between dependent and independent variables. In plaintiffs' analyses, the dependent variable was the vote received by the candidates studied. Race and income were the independent variables whose influence on the vote received was measured by the regression. There is little doubt that race has a strong correlation with the vote received by a candidate. These analyses covered every city commis-

4. *Sims v. Amos*, 336 F.Supp. 924 (M.D.Ala. 1972).

sion race in 1965, 1969, and 1973, both primary and general election of county commission in 1968 and 1972, and selected school board races in 1962, 1966, 1970, 1972, and 1974. They also covered referendums held to change the form of city government in 1963 and 1973 and a countywide legislative race in 1969. The votes for and against white candidates such as Joe Langan in an at-large city commission race, and Gerre Koffler, at-large county school board commission, who were openly associated with black community interests, showed some of the highest racial polarization of any elections.

Since the 1972 creation of single-member district, three blacks of the present fourteen member Mobile County delegation have been elected. Their districts are more heavily populated with blacks than whites.

Prichard, an adjoining municipality to Mobile, which in recent years has obtained a black majority population, elected the first black mayor and first black councilman in 1972.

Black candidates at this time can only have a reasonable chance of being elected where they have a majority or a near majority. There is no reasonable expectation that a black candidate could be elected in a citywide election race because of race polarization. The court concludes that an at-large system is an effective barrier to blacks seeking public life. This fact is shown by the removal of such a barrier, i. e., the disestablishment of the multi-member at-large elections for the state legislature. New single member districts were created with racial compositions that offer blacks a chance of being elected, and they are being elected.

The court finds that the structure of the at-large election of city commissioners combined with strong racial polarization of Mobile's electorate continues to effectively discourage qualified black citizens from seeking office or being elected thereby denying blacks equal access to the slating or candidate selection process.

## UNRESPONSIVENESS OF THE ELECTED CITY OFFICIALS TO THE BLACK MINORITY

The at-large elected city commissioners have not been responsive to the minorities' needs. The 1970 population of the city is 64.5% white and 35.4% black.[5]

The City of Mobile is one of the larger employers in southwestern Alabama. It provided a living for 1,858 persons in 1975. 26.3% were black. It is significant to note, that if the lowest job classification, service/maintenance, were removed from our consideration, only 10.4% of the employees would be black. Likewise, removing the lowest salary classification, less than $5,900 per year, only 13.8% of all city employees are black. (Plaintiff's Exhibit No. 73).

The Mobile Fire Department has only fifteen black employees out of a total of four hundred and thirty-five employees. It took an order of this court in *Allen v. City of Mobile*, 331 F.Supp. 1134 (S.D.Ala.1971), aff'd. 466 F.2d 122 (5th Cir. 1972), cert. denied 412 U.S. 909, 93 S.Ct. 2292, 36 L.Ed.2d 975 (1973) to desegregate the Mobile Police Department. That order set out guidelines designed to remove racial discrimination in hiring, promoting, assigning duties, and the rendering of services. The city is also operating under another court order enjoining racial discrimination, *Anderson v. Mobile County Commission*, Civil Action No. 7388–72–H (S.D.Ala.1973). The municipal golf course was desegregated only after litigation in federal court, *Sawyer v. City of Mobile*, 208 F.Supp. 548 (S.D. Ala.1961). This court in *Evans v. Mobile City Lines, Inc.*, Civil Action No. 2193–63 (S.D.Ala.1963), dealt with segregation in public transportation, and in *Cooke v. City of Mobile*, Civil Action No. 2634–63 (S.D. Ala.1963), dealt with segregation at the city airport.

There are 46 city committees with a total membership of approximately 482. Forty-seven are black and 435 are white. The total prior membership is 179 of which only 7 were black. (Plaintiffs' Exhibit No. 64).

---

**5.** See Footnote 1, *supra*.

The Industrial Development Board has fifteen members and no blacks and concerns itself with implementing a state law known as the "Cater Act" and the authorization of the issuance of municipal bonds for various business enterprises.

Seven committees were organized by private investment groups for the purpose of securing municipal bonding and the black-white makeup of these groups cannot be charged to the city commission. That total membership is 21. Although the membership of these seven committees cannot be charged to the city commissioners, the absence of blacks indicates the permeating results of past racial discrimination in the economic life of Mobile business. This is indicated both from the absence of blacks in the investment groups making use of municipal bonds and in that no black or black financial institutions have been able to take advantage of municipal bonds.

The Board of Adjustment, which consists of seven members, has one black. This is a critical board. It can grant variances from zoning laws and building codes involving less than two acres. The Codes Advisory Committee consists of 17 members and no blacks. This committee codifies all building regulations for all structures in the city.

The Mobile Housing Board supervises public housing. Public housing is occupied predominantly by blacks. Fifty thousand persons, approximately 25% of Mobile's population, most of whom are black, cannot buy or rent without subsidies in the private sector, or live in substandard housing.[6] There is one black on that board out of a membership of five.

The Educational Board provides plans and means to aid its employees in a continuing education program. It has nine members, none of whom are black. The county school system has approximately 55% white and 45% black population.[7] The black drop-out rate from school is higher than whites, therefore, the continuing education is most important to them.

There are several boards, to wit, Air-Conditioning, Architectural Board, Board of Examining Engineers, and Board of Electrical Examiners, which require special skills. There are 17 members of these boards, all white. National census figures indicate that there are far less blacks in skilled groups than whites. The court recognizes that qualified persons should be appointed, but black membership becomes *critical* on such committees because it is through these committees that licenses are granted to skilled occupations. The absence of blacks shows an insensitivity to this particularized need.

The city has not taken affirmative action to place blacks on these critical boards.

Most of the other committees are of various social and cultural nature in the city. No effort has been made to bring blacks into the mainstream of the social and cultural life by appointing them in anything more than token numbers. There are only three blacks out of 46 members on the Bicentennial Committee and only three out of 14 on the Independence Day Celebration Committee.

Primarily because of federal funding and prodding, the city's advisory group for the mass transit technical group has three blacks and five whites.

Mobile was originally founded on the west bank of the Mobile River. The land elevation for most of the business and residential area until World War II was from zero to ten feet. There has been a substantial western expansion from the Mobile Riv-

---

6. All of these are not in public housing. There are approximately 3,376 public housing units in the city with approximately 12,153 occupants.

7. The school system is countywide under the supervision of the Board of School Commissioners. The school system was desegregated in the case of *Birdie Mae Davis v. Board of School Commissioners*, Civil Action No. 3003–

63–H, pending, and is under the continuing supervision of this court. The city commission cannot be charged with any lack of responsiveness in the *Birdie Mae Davis* case. That case illustrates the permeation of racial discrimination in the city which constitutes two-thirds of the country's population.

er and Bay which lies to the east. Elevation in most of these areas ranges from 40 to 50 feet, but in some of the areas it reaches as much as 160 feet.

There are three principal watersheds in the Mobile area. Three Mile Creek, traverses the northern one-third of the city draining west to east. The southern one-third of the city is drained by Dog River running from west to east. The remaining one-third, which consists of old downtown and residential Mobile, drains east to the Mobile River. Mobile has an annual rainfall of 60 or more inches per year. It is subject to torrential downpours. All areas of Mobile, white and black, are traversed by open drainage ditches. All areas, white and black, are subject to standing water after torrential downpours with water in parts of all areas reaching the depth of one to two feet.

Mobile has a master drainage plan to be implemented over a long period of time. Unfortunately, most of the black residential areas are drained by the Three Mile Creek. The drainage system for Three Mile Creek involves issuing bonds and financing by the city which involves millions of dollars projected over several years. There has not been overt gross discrimination against the blacks in connection with the drainage project. However, almost all temporary relief in critical areas has been in the white areas. Somehow the white areas get relief with little temporary relief given the black areas.

The resurfacing and maintenance of streets in black neighborhoods significantly suffers in comparison with the resurfacing of streets in white neighborhoods. The testimony and an in-person visit of these areas by the court sustains this conclusion.

The U.S. Treasury Department, after a complaint filed by the NAACP, found racial discrimination in the city's resurfacing program. The city was advised by letter this would have to be corrected in order for the city to comply with the anti-discrimination provision of the Revenue Sharing Act. (Plaintiffs' Exhibit No. 111).

The construction of first class roads, curbs, gutters, and underground storm sewers are closely related to the drainage system. If this type of construction is done in areas subject to repeated flooding, it is a waste of money. The court observed that on the southside of Three Mile Creek near the Crichton area, which was formerly white—now mixed or predominantly black, in the areas near the creek and subject to flooding, the streets were paved with curb and gutters while on the northside, near the black Trinity Gardens area, only two streets have low-cost paving with curbs, gutters, and underground drainage. Most of the streets are unpaved. To put in first class paving in that black area would be unwise financially, but there is a significant difference and sluggishness in the response of the city to critical needs of the blacks compared to that in the white area.

There is the same difference and sluggishness between whites and blacks in making provisional or temporary mitigating improvements pending development of the master drainage plan throughout the city.

The Williamson School, in a predominantly black area, is in a densely populated residential and neighborhood business area. The houses are on lots large enough and far enough from the streets that the placing of sidewalks could be done without great difficulty. Children from low income families frequently walk or ride bicycles to and from school. Sidewalks are critical in such areas. There was a noticeable lack of sidewalks in and near the Williamson School.

The lack of sidewalks in the Plateau area presents a different problem. The streets are narrow and the lots are small. The houses are built very close to the streets. The personal inspection by the court revealed the obvious difficulty in placing sidewalks in that area.

Blacks in Mobile, and their neighborhoods, endure a greater share of infant deaths, major crimes, T.B. deaths, welfare cases, and juvenile delinquency than do whites in their neighborhoods. In *The Neighborhoods of Mobile: Their Physical*

*Characteristics and Needed Improvements (1969),* the Mobile City Planning Commission in Table Q of the Appendix, rates the 78 neighborhoods according to social blight. Nine of the 14 most blighted neighborhoods were predominantly black. The causes of this blight are multiple and it would be inaccurate to suggest that a single member district plan or the election of all black officials would correct them. Some of the causes, as the study in Table A indicates, include inadequate drainage, water, streets, sidewalks, and zoning. The city has a large responsibility in these areas. Although the city has not been totally neglectful, and the expense and problems are monumental, there is a singular sluggishness and low priority in meeting these particularized black neighborhood needs when compared with a higher priority of temporary allocation of resources when the white community is involved.

The Park and Recreation Program has generally been administered in an even-handed fashion, but a city projected park development program in the western part of the city over a period of years involving large sums of money indicates an expansion in predominantly white areas without a simultaneous consideration of the black area needs.

The black community has long complained of police brutality. A number of investigations have been made by the FBI but no indictments or evidence has been uncovered to substantiate serious charges of this nature. On March 28, 1976, a black was arrested near the scene of an alleged burglary. On April 8, an attorney for the law firm of the plaintiffs' attorney in this case reported to the Police Commissioner that there had been an alleged attempted or "mock" lynching of the black person arrested. On April 9, a meeting was held between the commission, the black non-partisan voters league, the district attorney's office, the chief of police, and others concerning this instance.

The blacks claimed the charges were so serious that the arresting officer should be suspended immediately. It is claimed by the plaintiffs that this officer at that time had pending against him a case of alleged police brutality. The City Attorney immediately obtained some statements of the alleged "mock" lynching indicating there was substance in the charges. On April 13, that officer was discharged and seven others were suspended. Five indictments were returned in connection with the alleged "mock" lynching. The court does not deem it appropriate to make further comments concerning the details. Suffice it to say, there was a timid and slow reaction by the city commission to the alleged "mock" lynching.

The Police Department then instituted an investigation on the older pending charges. As a result of the investigation, two officers were discharged and six were suspended, all in connection with charges of police brutality but concerning unrelated incidents occurring prior to the alleged "mock" lynching.

Shortly thereafter there were twenty to thirty alleged cross burnings in Mobile and adjoining Baldwin County. Two of these were reported to have been in the City of Mobile. The lack of reassurance by the city commission to the black citizens and to the concerned white citizens about the alleged "mock" lynching and cross burnings indicates the pervasiveness of the fear of white backlash at the polls and evidences a failure by elected officials to take positive, vigorous, affirmative action in matters which are of such vital concern to the black people. The sad history of lynch mobs, racial discrimination and violence attributed to cross-burners or fellow-travelers, justifiably raises specters and fears of legal and social injustice in the minds and hearts of black people. White people who are committed to the American ideal of equal justice under the law are also apprehensive. This sluggish and timid response is another manifestation of the low priority given to the needs of the black citizens and of the political fear of a white backlash vote when black citizens' needs are at stake.

## THERE IS NO TENUOUS STATE POLICY SHOWING A PREFERENCE FOR AT–LARGE DISTRICTS

There is no clear cut *State* policy either for or against multi-member districting or at-large elections in the State of Alabama, considered as a whole. The lack of State policy therefore must be considered as a neutral factor.

In considering the State policy with specific reference to Mobile, the court finds that the city commission form of government was passed in 1911. That law provided for the election of the city commissioners at-large. This feature has not been changed although there have been some amendments to designate duties for the commissioners as well as to designate numbered places. Beginning in 1819, the year Alabama became a state in the Union, until 1911, the great majority of the time the city operated under a mayor-alderman form of government. The election for the mayor and aldermen was either at-large or from multi-member districts or wards. The manifest policy of the City of Mobile has been to have at-large or multi-member districting.

## PAST RACIAL DISCRIMINATION

Prior to the Voting Rights Act of 1965, there was effective discrimination which precluded effective participation of blacks in the elective system in the State, including Mobile.

One of the primary purposes of the 1901 Constitutional Convention of the State of Alabama was to disenfranchise the blacks. The Convention was singularly successful in this objective. The history of discrimination against blacks' participation, such as the cumulative poll tax, the restrictions and impediments to blacks registering to vote, is well established.

Local discrimination in the city and the county has already been noted in connection with the lawsuits concerning racial discrimination arising in this court, to wit, the *Allen, Anderson, Sawyer, Evans,* and *Cooke, supra,* cases. *Preston v. Mandeville,* 479 F.2d 127 (5th Cir. 1973) was a county-wide case involving racial discrimination of Mobile's jury selection practices. *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed.2d 987 (1944) (white primaries) was applicable to Alabama and some Alabama cases of discrimination are *Davis v. Schnell,* 81 F.Supp. 872 (S.D.Ala.1949), aff'd. 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093 (1949) ("interpretation" tests for voter registration), *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (racial gerrymandering of local government), *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (racial gerrymandering of state government), and *U. S. v. Alabama,* 252 F.Supp. 95 (M.D.Ala.1966) (Alabama poll tax).

The racial polarization existing in the city elections has been discussed herein. The court finds that the existence of past discrimination has helped preclude the effective participation of blacks in the election system today in the at-large system of electing city commissioners.

In the 1950's and early sixties, prior to the Voting Rights Act of 1965, only a relatively small percentage of the blacks were registered to vote in the county and city.[8] Since the 1965 Voting Rights Act, the blacks have been able to register to vote and become candidates.

## ENHANCING FACTORS

With reference to the enhancing factors, the court finds as follows:

(1) The citywide election encompasses a large district. Mobile has an area of 142 square miles with a population of 190,026 in 1970.

(2) The city has a majority vote requirement. Alabama Acts 281 (1911) at 343, requires election of commissioners by a majority vote.

---

**8.** In the 1950's or 1960's the impediments placed in the registration of blacks to vote was not as aggravated in Mobile County as in some counties. It was not necessary for federal voter registrars to be sent to Mobile to enable blacks to register.

(3) There is no anti-single shot voting provision but the candidates run for positions by place or number.[9]

(4) There is a lack of provision for the at-large candidates to run from a particular geographical sub-district, as well as a lack of residence requirement.

■ The court concludes that in the aggregate, the at-large election structure as it operates in the City of Mobile substantially dilutes the black vote in the City of Mobile.

## CONCLUSIONS OF LAW

### I

There is a threshold question faced by this court in whether or not *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), is dispositive of this case so as to preclude an application of the factors determinative of voter dilution as set forth in *White, supra,* and *Zimmer, supra,* aff'd. *sub nom. East Carroll Parish School Board, supra.*

It is the defendants' contention that *Washington* makes it clear that to prevail the plaintiffs must prove that the city commission form of government was adopted for Mobile in 1911 with a discriminatory *purpose.* They further contend that since the 1901 Constitution of Alabama effectively disenfranchised the blacks, the at-large system adopted for the city commission in 1911 had no relation to minimizing or diluting the black vote because there was none. The city further contends that the commission form of government was adopted for purposes of executive efficiency and for an abandonment of the then corrupt aldermanic district elections. The plaintiffs contend that *Washington did not establish a new Supreme Court purpose* test.

The thrust of the defendants' argument is that if the 1911 statute creating the at-large city commission form of government election was neutral on its face *Washington does not* permit this court to consider other evidence or factors and must decide the case in the city's favor. It is argued that *Washington* is a benchmark decision requiring this finding in the multi-member at-large city elections.

*Washington* upheld the validity of a written personnel test administered to prospective recruits by the District of Columbia Police Department. It had been alleged the test "excluded a disproportionately high number of Negro applicants." *Id.,* 426 U.S. at 233, 96 S.Ct. at 2044. The petitioners claimed the effect of this disproportionate exclusion violated their Fifth Amendment due process rights and 42 U.S.C. § 1981. *Id.,* 96 S.Ct. at 2044. Evidence indicated that four times as many blacks failed to pass the test as whites. Plaintiffs contended the impact in and of itself was sufficient to justify relief. They made no claim of an intent to discriminate. The District Court found no intentional conduct and refused relief. The Circuit Court reversed, relying upon *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). *Griggs* was a Title VII action (42 U.S.C. § 2000e, *et seq.*) in which the racially discriminatory impact of employment tests resulted in their invalidation by the court.

The Supreme Court in *Washington* reconciled its decision with several previous holdings, distinguished some, and expressly overruled some cases in which there were possible conclusions different from *Washington.*

They made *no reference to the recent pre-Washington* cases of its or appellate courts' voting dilution decisions dealing with at-large or multi-member versus single member districts, and, in particular, no

---

9. The influence of this enhancing factor is minimal. Voters could scarcely make an intelligent choice for the best person to serve as a commissioner to perform specific duties, such as Department of Finance, without a numbered or place system. It is this writer's opinion, born out of 15 years experience in a State judicial office subject to the electoral process, that the public's best interest is served, and it can make more intelligent choices, when candidates run for numbered positions. The choices between candidates are narrowed for the voter and they can be compared head to head.

mention was made of the cardinal case in this area, *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2342, 37 L.Ed.2d 314 (1973), nor to *Dallas v. Reese,* 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975), and *Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975), nor to *Zimmer,* which the Court had affirmed only a few months before, nor to *Turner v. McKeithen,* 490 F.2d 191 (5th Cir. 1975). No reference was made to *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), to *Reynolds,* nor to *Whitcomb.* *Whitcomb,* 403 U.S. at 143, 91 S.Ct. 1858, 29 L.Ed.2d 363, recognized that in an at-large election scheme, a showing that if in a particular case the system operates to minimize or cancel out the voting strength of racial or political elements, the courts can alter the structure. Had the Supreme Court intended the *Washington* case to have the far reaching consequences contended by defendants, it seems to this court reasonable to conclude that they would have made such an expression.

There are several reasons which may be plausibly advanced as to why the *Washington* Court did not expressly overrule nor discuss these cases. Courts are not prone to attempt to decide every eventuality of a case being decided or its effect on all previous cases. The Court may have desired that there be further development of the case law in the district and circuit courts before commenting on the application of *Washington* to this line of cases. The cases may be distinguishable and reconcilable with the expressions in *Washington.* Or, it may not have been the intention of the *Washington* Court to include these cases within the ambit of its ruling.

*Washington* spoke with approval of *Wright v. Rockefeller,* 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), setting out the "intent to gerrymander" requirement es-

tablished in *Wright.* *Washington,* 426 U.S. at 240, 65 S.Ct. at 2047–48.

*Wright* was the direct descendant of *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). These two cases involved racial gerrymandering of political lines. *Gomillion* dealt with an attempt by the Alabama legislature to exclude most black voters from the municipal limits of Tuskegee so whites could control the elections. The Court found that the State of Alabama impaired the voting rights of black citizens while cloaking it in the garb of the realignment of political subdivisions and held there was a violation of the Fifteenth Amendment. *Gomillion, supra,* 364 U.S. at 345, 81 S.Ct. 125. There was no direct proof of racial discriminatory intent. Justice Stevens in his concurring opinion noted with approval, ". . . when the disproportion[ate impact] is as dramatic as in *Gomillion,* . . ., it really does not matter whether the standard is phrased in terms of *purpose or effect.*" *Washington, supra,* 426 U.S. at 254, 96 S.Ct. at 2054.[10] (emphasis added).

*Wright* dealt with the issue of congressional redistricting of Manhattan. The plaintiffs alleged racially motivated districting. The congressional lines drawn created four districts. One had a large majority of blacks and Puerto Ricans. The other three had large white majorities. The court held the districts were not unconstitutionally gerrymandered upon the finding that ". . . the New York legislature was [not] motivated by racial considerations or in fact drew the districts on racial lines." *Wright,* 376 U.S. at 56, 84 S.Ct. at 605. This set forth the principle that in gerrymandering cases in order for the plaintiffs to obtain relief they must show racial motivation in the drawing of the district lines.

---

10. In *Paige v. Gray,* 538 F.2d 1108 (5th Cir. 1976), black citizens of Albany, Georgia, brought an action to invalidate the at-large system of electing city commissioners. At 1110 n.3, the court noted the above quote by Justice Stevens, but in the body of the opinion expressed concern with unlawful motive for discriminatory purpose as required by *Wash-*

*ington.* However, at 1110, the court stated "the validity of Albany's change from a ward to an at-large system can best be handled by applying the multifactor test enunciated in . . . *White v. Regester* . . . and *Zimmer v. McKeithen.*" *Paige,* at 1111, stated *Zimmer* still "sets the basic standard in this circuit."

*Washington* then quoted with approval from *Keyes v. School District No. I,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), indicating a distinction or reconciliation of that case with *Washington.* There had not been racial purpose or motivation *ab initio* in *Keyes. Keyes* was a Denver, Colorado, school desegregation case. Denver schools had never been segregated by force of state statute or city ordinance. Nevertheless, the majority found that the *actions* of the School Board during the 1960's were sufficiently indicative of ". [a] *purpose* or *intent* to segregate" and a finding of *de jure* segregation was sustained. *Keyes,* 413 U.S. at 205, 208, 93 S.Ct. 2686, 2697. The Court held that to find overt racial considerations in the *actions* of government officials is indeed a difficult task.[11]

*Washington* further commented:

".  .  . an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Washington, supra,* 426 U.S. at 242, 96 S.Ct. at 2049.

The plaintiffs contend that *Washington's* discussion with approval of the *Keyes* case permits the application of the "tort" standard in proving intent. In his concurring opinion, Justice Stevens discussed this point:

"Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For *normally the actor is presumed to have intended the natural consequences of his deeds.* This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decision-making, and of mixed motivation."

*Washington, supra,* 426 U.S. at 253, 96 S.Ct. at 2054 (emphasis added).

The plaintiffs contend this circuit's use of the tort standard of proving intent squares with the above statements. This circuit for several years has accepted and approved the tort standard as proof of segregatory intent as a part of state action in school desegregation findings. *Morales v. Shannon,* 516 F.2d 411, 412–13 (5th Cir. 1975), *cert. den.* 423 U.S. 1034, 96 S.Ct. 566, 46 L.Ed.2d 408 (1975).

Recently, citing *Morales, supra, Cisneros v. Corpus Christi Independent School District,* 467 F.2d 142 (5th Cir. 1972) (en banc), *cert. den.* 413 U.S. 920, 93 S.Ct. 3053, 37 L.Ed.2d 1041 (1973), *reh. den.* 414 U.S. 881, 94 S.Ct. 3015, 38 L.Ed.2d 1249 (1973), and *United States v. Texas Educational Agency,* 467 F.2d 848 (5th Cir. 1972) (en banc) (Austin I), the Fifth Circuit in *U. S. v. Texas Education Agency* (Austin Independent School District) 532 F.2d 380 (5th Cir. 1976) (Austin II) squarely addressed the meaning of discriminatory intent in the following language:

"Whatever may have been the originally intended meaning of the tests we applied in *Cisneros* and *Austin I* [ *U. S. v. Texas Education Agency, supra,*], we agree with the intervenors that, after *Keyes,* our two opinions must be viewed as incorporating in school segregation law the ordinary rule of tort law that a person intends the natural and foreseeable consequences of his actions.

\*    \*    \*    \*    \*    \*

Apart from the need to conform *Cisneros* and *Austin I* to the supervening *Keyes* case, there are other reasons for attributing responsibility to a state official who should reasonably foresee the segregative effects of his actions. First, it is difficult—and often futile—to obtain direct evidence of the official's intentions.  .  . Hence, courts usually rely on circumstan-

---

11. In another Fifth Circuit case it was held that if an official is motivated by such wrongful intent, he or she

"  .  . will pursue his discriminatory practices in ways that are devious, by meth-

ods subtle and elusive—for we deal with an area in which 'subtleties of conduct  .  .  . play no small part' ". *U. S. v. Texas Ed. Agency,* 532 F.2d 380, 388 (5th Cir. 1976) (Austin II) (school desegregation).

tial evidence to ascertain the decision-makers' motivations." *Id.* at 388.

This court in its findings of fact has held that when the 1911 statute was enacted, at a time the blacks were disenfranchised, the statute on its face was neutral. This is in line with Fifth Circuit opinions, *McGill v. Gadsden Co. Commission*, 535 F.2d 277 (5th Cir. 1976), *Wallace v. House*, 515 F.2d at 633 (5th Cir. 1975), vacated 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191 (5th Cir. 1976), affirmed the District Court and *Taylor v. McKeithen*, 499 F.2d 893, 896 (5th Cir. 1974). However, in the larger context, the evidence is clear that one of the primary purposes of the 1901 constitutional convention was to disenfranchise the blacks.[12]

Therefore, the legislature in 1911 was acting in a race-proof situation. There can be little doubt as to what the legislature would have done to prevent the blacks from effectively participating in the political process had not the effects of the 1901 constitution prevailed. The 1901 constitution and the subsequent statutory schemes and practices throughout Alabama, until the Voting Rights Act of 1965, effectively disenfranchised most blacks.

A legislature in 1911, less than 50 years after a bitter and bloody civil war which resulted in the emancipation of the black slaves, should have reasonably expected that the blacks would not stay disenfranchised. It is reasonable to hold that the present dilution of black Mobilians is a natural and foreseeable consequence of the at-large election system imposed in 1911.

Under Alabama law, the legislature is responsible for passing acts modifying the form of city and county governments. Mobile County elects or has an effective electoral voice in the election of eleven members of the House and three senators. The state legislature observes a courtesy rule, that is, if the county delegation unanimously endorses local legislation the legislature perfunctorily approves all local county legislation. The Mobile County Senate delegation of three members operates under a courtesy rule that any one member can veto any local legislation. If the Senate delegation unanimously approves the legislation, it will be perfunctorily passed in the State Senate. The county House delegation does not operate on a unanimous rule as in the Senate, but on a majority vote principle, that is, if the majority of the House delegation favors local legislation, it will be placed on the House calendar but will be subject to debate. However, the proposed county legislation will be perfunctorily approved if the Mobile County House delegation unanimously approves it. The evidence is clear that whenever a redistricting bill of any type is proposed by a county delegation member, a major concern has centered around how many, if any, blacks would be elected. These factors prevented any effective redistricting which would result in any benefit to the black voters passing until the State was redistricted by a federal court order.[13] There are now three blacks on the eleven member House legislative delegation. This resulted in passage in the 1975 legislature of a bill doing away with the at-large election of the County Board of School Commissioners and creating five single member districts. This was promptly attacked by the all-white at-large elected County School Board Commission in the State court. The act was declared unconstitutional for failure to have met constitutional requirements concerning advertisement.

This natural and foreseeable consequence of the 1911 Act, black voter dilution, was brought to fruition in 50 odd years, the middle 1960's, and continues to the present. This court sees no reason to distinguish a school desegregation case from a voter dis-

---

12. The history of Alabama indicates that there was a populist movement at that time which sought to align the blacks and the poor whites. The Bourbon interests of the State sought to disenfranchise the poor whites along with the blacks but were unsuccessful, excepting the cumulative feature of the poll tax. They were singularly successful in disenfranchising the blacks.

13. *Sims v. Amos*, 336 F.Supp. 924 (M.D.Ala. 1972).

crimination case. It appears to this court that the evidence supports the tort standard as advocated by the plaintiffs. However, this court prefers not to base its decision on this theory. This court deems it desirable to determine if the far-reaching consequence of *Washington* as advanced by the defendants is correct without regard to *Keyes*. This court is unable to accept such a broad holding with such far-reaching consequences.

The case *sub judice* can be reconciled with *Washington*. The *Washington* Court, in Justice White's majority opinion, included the following:

> "This is not to say that the necessary discriminatory racial purpose must be express or appear on the face of the statute, or that a law's disproportionate impact is irrelevant in cases involving Constitution-based claims of racial discrimination. A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race. *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)." *Washington, supra*, 426 U.S. at 241, 96 S.Ct. at 2048.

To hold that the 1911 facially neutral statute would defeat rectifying the invidious discrimination on the basis of race which the evidence has shown in this case would fly in the face of this principle.

It is not a long step from the *systematic exclusion of blacks* from juries which is itself such an "unequal application of the law . . . as to show intentional discrimination," *Akins v. Texas*, 325 U.S. 398, 404, 65 S.Ct. 1276, 1279, 89 L.Ed. 1692 (1945), and the deliberate systematic denials to people from juries because of their race, *Carter v. Jury Commission*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), *Cassell v. Texas*, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950), *Patton v. Mississippi*, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947), cited in *Washington, supra*, 426 U.S. at 239–40, 96 S.Ct. at 2047, to a present purpose to dilute the black vote as evidenced in this case. There is a "current" condition of dilution of the black vote resulting from intentional state legislative *inaction* which is as effec-

tive as the intentional state action referred to in *Keyes. Washington, supra*, 426 U.S. at 240, 96 S.Ct. at 2048.

More basic and fundamental than any of the above approaches is the factual context of *Washington* and this case. Initial discriminatory purpose in employment and in redistricting is entirely different from resulting voter dilution because of racial discrimination. *Washington's* failure to expressly overrule or comment on *White, Dallas, Chapman, Zimmer, Turner, Fortson, Reynolds,* or *Whitcomb*, leads this court to the conclusion that *Washington* did not overrule those cases nor did it establish a new Supreme Court *purpose* test and require initial discriminatory purpose where voter dilution occurs because of racial discrimination.

## II

In order for this court to grant relief as prayed for by plaintiffs, it must be shown that the political process was not open equally to the plaintiffs as a result of dilution of voting strength and consequently the members of the class had less opportunity to participate in the political process and elect representatives of their choice. *Chapman*, 420 U.S. at 18, 95 S.Ct. 751, and *Whitcomb*. "Access to the political process and not [the size of the minority] population" is the key determinant in ascertaining whether there has been invidious discrimination so as to afford relief. *White*, 412 U.S. at 766, 93 S.Ct. 2332; *Zimmer*, 485 F.2d at 1303.

The idea of a democratic society has since the establishment of this country been only a supposition to many citizens. The Supreme Court vocalized this realization in *Reynolds* where it formulated the "one person-one vote" goal for political elections. The precepts set forth in *Reynolds* are the substructure for the present voter dilution cases, stating that "every citizen has an inalienable right to full and effective participation in the political processes . . ." *Reynolds*, 377 U.S. at 565, 84 S.Ct. at 1383. The Judiciary in subsequent cases has recognized that this principle is violated when

a particular identifiable racial group is *not* able to fully and effectively participate in the political process because of the system's structure.

Denial of full voting rights range from outright refusal to allow registration, *Smith v. Allwright, supra,* to racial gerrymandering so as to exclude persons from voting in a particular jurisdiction, *Gomillion v. Lightfoot, supra,* to establishing or maintaining a political system that grants citizens all procedural rights while neutralizing their political strength, *White v. Regester, supra.* The last arrangement is maintained by the City of Mobile.

Essentially, dilution cases revolve around the "quality" of representation. *Whitcomb,* 403 U.S. at 142, 91 S.Ct. 1858. The touchstone for a showing of unconstitutional racial voter dilution is the test enunciated by the Supreme Court in *White,* 412 U.S. at 765, 93 S.Ct. at 2339: Whether "multi-member districts are being used invidiously to cancel out or minimize the voting strength of racial groups." In *White,* for slightly different reasons in each county, the Supreme Court found that the multi-member districts in Dallas and Bexar Counties, Texas, were minimizing black and Mexican-American voting strength.

█ Attentive consideration of the evidence presented at the trial leads this court to conclude that the present commission form of government in the City of Mobile impermissibly violates the constitutional rights of the plaintiffs by improperly restricting their access to the political process. *White,* 412 U.S. at 766, 93 S.Ct. 2332; *Whitcomb,* 403 U.S. at 143, 91 S.Ct. 1858. The plaintiffs have discharged the burden of proof as required by *Whitcomb.*

This court reaches its conclusion by collating the evidence produced and the law propounded by the federal appellate courts. The controlling law of this Circuit was enunciated by Judge Gewin in *Zimmer,* which closely parallels *Whitcomb* and *White.*[14] The *Zimmer* court, in an *en banc* hearing, set forth four primary and several "enhancing" factors to be considered when resolving whether there has been impermissible voter dilution. The primary factors are:

". . . a lack of access to the process of slating candidates, the unresponsiveness of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case [for relief] is made." *Zimmer* at 1305. (footnotes omitted).

The enhancing factors include:

"a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts." *Ibid.* (footnotes omitted).

1. LACK OF OPENNESS IN THE SLATING PROCESS OR CANDIDATE SELECTION PROCESS TO BLACKS

First, the political parties in the City of Mobile do not slate candidates per se; rather, any person interested in running for the position of city commissioner is able to do so. There has been little evidence to a "party" supporting one candidate or another in the city races.

The system at first blush appears to be neutral, but consideration of facts beneath the surface demonstrate the *effects* which lead the court to conclude otherwise. No black has ever been elected city commissioner in Mobile. The evidence indicates that black politicians who have previously been candidates in at-large elections and would run again in the smaller single member districts, shy away from city at-large elections. One of the principal reasons is the polarization of the white and black vote. The court is concerned with the effect of lack of openness in the electoral system in determining whether the multi-member at-large election system of the city commissioners is invidiously discriminatory.

14. See also *Paige v. Gray,* 538 F.2d 1108 (5th Cir. 1976).

In *White,* the Supreme Court expressed concern with any type of barrier to effective participation in the political process. *Zimmer,* 485 F.2d at 1305 n. 20, expressed its view in this language: "the standards we enunciate today are applicable whether it is a specific law or a custom or practice which causes diminution of a minority voting strength."

There is a lack of openness to blacks in the political process in city elections.

## 2. UNRESPONSIVENESS OF THE ELECTED CITY OFFICIALS TO THE BLACK MINORITY

It is the conclusion of the court that the city-wide elected municipal commission form of government as practiced in the City of Mobile has not and is not responsive to blacks on an equal basis with whites; hence there exists racial discrimination. Past administrations not only acquiesced to segregated folkways, but actively enforced it by the passage of numerous city ordinances. There have been orders from this court to desegregate the police department, the golf course, public transportation, the airport, and which attack racial discrimination in employment.[15]

There has been a lack of responsiveness in employment and the use of public facilities. It is this court's opinion that leadership should be furnished in non-discriminatory hiring and promotion by our government, be it local, state, or federal.[16]

In addition to the refusal of officials to voluntarily desegregate facilities, the city commissioners have failed to appoint blacks to municipal committees in numbers even approaching fair representation. Appointments to city committees are important not only to obtain diverse opinions from all parts of the community and share fairly what power the committees have, but for the black community it would open parts of the governmental processes to those to whom they have for so long been denied. The city commission's custom or policy of appointing disproportionately few blacks to committees is a clear reflection of the at-large election system's dilution of blacks' influence and participation. The commissioners appoint citizens from their neighborhoods and constituencies, which are virtually all white. The commissioners have relatively less contact with the black community and hence are not as likely to know of black citizens who are qualified and interested in serving on committees. Recognizing the admonitions of the courts when judicially dealing with discretionary appointments, *Mayor of the City of Philadelphia v. Educational Equality League,* 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974), and *James v. Wallace,* 533 F.2d 963 (5th Cir. 1976), that it is not within the authority of this court to order particular appointments, it is this court's view that the failure to appoint a significant number of blacks is indicative of a lack of responsiveness.

## 3. NO TENUOUS STATE POLICY SHOWING A PREFERENCE FOR AT–LARGE DISTRICTS

The Alabama legislature has offered little evidence of a preference one way or the

---

**15.** The County School Board, which operates both in the city and county, has been in federal court continuously since 1963 to effect meaningful desegregation. *Davis v. Mobile County School Board,* Civil Action No. 3003–63 (S.D. Ala.1963). Incidentally, during the course of the court's continuing jurisdiction in *Davis,* there have been fifteen or more appeals to the Fifth Circuit.

**16.** *Norman R. McLaughlin, etc. v. Howard H. Callaway, et al.,* 382 F.Supp. 885, 895 (S.D.Ala. 1974) stated:

"It is only fitting that the government take the lead in the battle against discrimination by ferreting out and bringing an end to racial discrimination in its own ranks."

Mobile has no ordinances proclaiming equal employment opportunity, either public or private, to be its policy. There are no non-discriminatory rental ordinances. On the one hand, the federal courts are often subjected to arguments by recalcitrant state and local officials of the encroachment of the federal bureaucracy and assert Tenth Amendment violations—while making no mention that were it not for such "encroachment" citizens would not have made the progress they have to fulfillment of equal rights. Recent history bears witness to this proposition.

other for multi-member or at-large districts in cities the size of Mobile. For example, Title 37, § 426, *Code of Alabama* (Supp. 1973), provides for a number of various forms of either multi-member or single-member municipal governments, with a municipality's option often dictated by its size. Mobile, with a population exceeding 50,000 persons, is allowed by Title 37, § 426, to have a mixture of single-member and at-large aldermen. Consequently, this court finds state policy regarding multi-member at-large districting as neutral.

Mobile itself has had a mixed history concerning its local preference for representative districting, particularly prior to the adoption of the commission government in 1911. Elections were usually at-large but at times there were some ward residency requirements and multi-member ward elections. Since 1911, however, the city commission has been elected in citywide at-large elections.

### 4. PAST RACIAL DISCRIMINATION

It is this court's opinion that fair and effective participation under the present electoral system is, because of its structure, difficult for the black citizens of Mobile. Past discriminatory customs and laws that were enacted for the sole and intentional purpose of extinguishing or minimizing black political power is responsible. The purposeful excesses of the past are still in evidence today. Indeed, Judge Rives, writing for a three-judge panel finding the Alabama poll tax to be unconstitutional, stated forcefully:

" 'The long history of the Negroes' struggle to obtain the right to vote in Alabama has been trumpeted before the Federal Courts of this State in great detail. * * If this Court ignores the long history of racial discrimination in Alabama, it will prove that justice is both blind and deaf.' We would be blind with indifference, not impartiality, and deaf with intentional

disregard of the cries for equality of men before the law." *U. S. v. State of Alabama,* 252 F.Supp. at 104 (M.D.Ala.1966) [citing *Sims v. Baggett,* 247 F.Supp. 96, 108–09 (M.D.Ala.1965)].

Without question, past discrimination, some of which continues to today as evidenced by the orders in several lawsuits in this court against the city and county, and demonstrated in the lack of access to the selection process and the city's unresponsiveness, contributes to black voter dilution.

### 5. ENHANCING FACTORS

*Zimmer,* in addition to enumerating four substantial criteria in proving voter dilution, listed four "enhancing factors" that should be considered as proof of aggravated dilution.

a. *Large Districts.* The present at-large election system is as large as possible, i. e., the city. The city with an area of 142 square miles, and more than 190,000 persons, can reasonably be divided into election districts or wards. It is common knowledge that numerous towns and cities of much less size in Alabama are so divided and function reasonably well. It is large enough to be considered large within the meaning of this factor.

b. *Majority Vote Requirements.* Alabama Acts No. 281 (1911) at 343, which established the Mobile commission form of government, required the election of the representatives by a majority vote.

c. *Anti-single Shot Voting.* There is in Act No. 281 "no anti-single shot" voting provisions nor is there one in the current codification, [Ala.Code, Title 37, § 89, *et seq.*] or in Alabama Acts No. 823 (1965) at 1539.[17]

The numbered place provision of Act 823 (or, if Act 823 is invalid, Ala.Code, Title 37, § 94) has to some extent the same result. At least in part, the practical result of an anti-single shot provision obtains in Mobile.[18]

---

17. An "anti-single shot" provision obtained in all city elections from 1951 to 1961, see Ala. Code, Title 37, § 33(1), but was repealed 9/15/61.

18. See footnote 9, *supra.*

d. *Lack of Residency Requirement.* Act 281 does not contain any provision requiring that any commissioners reside in any portion of town.[19]

## III

The court has made a finding for each of the *Zimmer* factors, and most of them have been found in favor of the plaintiffs. The court has analyzed each factor separately, but has not counted the number present or absent in a "score-keeping" fashion.

The court has made a thoughtful, exhaustive analysis of the evidence in the record ". . . [paying] close attention to the facts of the particular situations at hand," *Wallace,* 515 F.2d at 631, to determine whether the minority has suffered an unconstitutional dilution of the vote. This court's task is not to tally the presence or absence of the particular factors, but rather, its opinion represents ". . . a blend of history and an intensely local appraisal of the design and impact of the . . . multi-member district [under scrutiny] in light of past and present reality, political and otherwise." *White,* 412 U.S. at 769–70, 93 S.Ct. at 2341.

The court reaches its conclusion by following the teachings of *White, Dallas v. Reese,* 421 U.S. 477, 480, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975), *Zimmer, Fortson,* and *Whitcomb, et al.*

The evidence when considered under these teachings convinces this court that the at-large districts "operate to minimize or cancel out the voting strength of racial or political elements of the voting population." *Whitcomb,* 403 U.S. at 143, 91 S.Ct. at 1869, and *Fortson,* 379 U.S. at 439, 85 S.Ct. 498, and "operates impermissibly to dilute the voting strength of an identifiable element of the voting population,". *Dallas,* at 480, 95 S.Ct. at 1708. The plaintiffs have

met the burden cast in *White* and *Whitcomb* by showing an aggregate of the factors cataloged in *Zimmer.*

In summary, this court finds that the electoral structure, the multi-member at-large election of Mobile City Commissioners, results in an unconstitutional dilution of black voting strength. It is "fundamentally unfair", *Wallace,* 515 F.2d at 630, and invidiously discriminatory.

The Supreme Court has laid down the general principle that "when district courts are forced to fashion apportionment plans, single-member districts are preferable to large multi-member districts as a general matter." *Connor v. Johnson,* 402 U.S. 690, 692, 91 S.Ct. 1760, 1762, 29 L.Ed.2d 268 (1971). The Court reaffirmed this twice in the last term. *East Carroll Parish School Board,* and *Wallace, supra.* Once the racial discriminatory evil has been established, as it was in *White,* the dilution occasioned by the multi-member at-large election requires the disestablishment of the multi-member at-large election and the obvious remedy is to establish single member districts.

This court does not endorse the idea of quota voting or elections, nor of a weighted vote in favor of one race to offset racial prejudice or any other adversity. However, when the electoral structure of the government is such, as in this case, that racial discrimination precludes a black voter from an effective participation in the election system, a dilution of his and other black votes has occurred.

The moving spirit present at the conception of this nation, "all men are created equal," will not rest and the great purpose of the Constitution to "establish Justice, insure domestic Tranquility, . . . and secure the Blessings of Liberty to ourselves and our Posterity. . . ." will be only a

---

19. To impose residency requirements under Act 823, the designation of duty provision (or if Act 823 is invalid, Ala.Code, Title 37, § 94, the numbered position provision), as well as the 1911 establishment of at-large election of city commissioners would at a minimum be anomalous and probably unconstitutional. City commissioners in command of particular functions,

such as public safety, residing and being elected from one particular side of town, would be accountable to only one-third of the population notwithstanding jurisdiction over the entire city. *B. U. L. L. v. City of Shreveport,* 71 F.R.D. 623 (W.D.La.1976), also expresses this view.

dream until every person has an opportunity to be equal. To have this opportunity, every person must be treated equally. This includes being treated equally in the electoral process.

A city government plan which includes small single-member districts will provide blacks a realistic opportunity to elect blacks to the city governing body. No such realistic opportunity exists as the city government is presently structured. A mayor-council plan with single-member council districts, would afford such an opportunity. Blacks effective participation in the elective system will have the salutary effect of giving them a realistic opportunity to get into the mainstream of Mobile's life, not only in the political life, but will give them an opportunity to have an input and impact on the economic, social, and cultural life of the city. It will afford an opportunity for a more meaningful dialogue between the whites and blacks to develop.

### IV

There is a traditional constitutional tolerance of various forms of local government. See, e. g., *Abate v. Mundt*, 403 U.S. 182, 185, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971).

The court recognizes the "delicate issues of federal-state relations underlying this case." *Mayor of the City of Philadelphia, supra*, 415 U.S. at 615, 94 S.Ct. at 1331.

The futility of piecemeal efforts to correct racially discriminatory problems here has been demonstrated in *Davis v. Board of School Commissioners*, as well as the suits previously filed against the city. The city commission form of government is newer and less widely used than the mayor-councilman (or alderman) form. Mobile operated under a mayor-councilman (in Mobile history sometimes called commissioner, mayor-alderman, etc.) plan from the time Alabama entered the Union in 1819 until 1911. Most of the other municipalities in the county and state operate under such a plan. The change is not from the known to the unknown or from the old to the new. The court is unable to see how the impermissibly unconstitutional dilution can be effectively corrected by any other approach.

The defendants have argued the governing body needs a citywide perspective, and quoted 87 Harv.L.Rev. 1851, 1857 (1974). "The districtwide perspective and allegiance which result from representatives being elected at-large, and which enhance their ability to deal with districtwide problems, would seem more useful in a public body with responsibility only for the district than in a statewide legislature."

In a mayor-councilman plan, the mayor, the principal governing official, will be elected at-large and will have this citywide perspective, but the governing body will have the benefit of members from single member districts.[20]

20. *Dove, et al. v. Moore, et al.*, 539 F.2d 1152 (8th Cir. 1976), set out at n.3;

"The author has previously discussed at length the undesirable characteristics of at-large elections and the benefits of single-member districts. *Chapman v. Meier*, 372 F.Supp. 371, 388–94 (D.N.D.1974) (three-judge court) (Bright, J., dissenting), *majority reversed*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975). In the context of a discussion of proposed plans for the reapportionment of a state legislature, the dissent emphasized the following benefits of single-member districts:

(1) It gives a voter a chance to compare only two candidates, head to head in making a choice.

(2) It prevents one political party with a heavy plurality in one or two potential districts from dominating other potential districts that might narrowly go for the candidate of the opposite party.

(3) It prevents a city wide political organization from ostracizing or disciplining a legislator, who dares stray from the machine's line.

(4) It permits a citizen to identify a legislator as his senator and makes direct communication easier.

(5) It makes each senator responsible for his actions and makes it difficult for a senator to fade into the ranks of "the team" to avoid being identified with specific actions taken.

(6) It reduces campaign costs and "personalizes" a campaign.

(7) It creates greater interest in the possibility of a citizen seeking a legislative seat without the political machine blessing.

(8) It would diminish the animosity created in the legislature against multi-senate districts because of the tendency of senators

■ It is the court's conclusion that a mayor-councilman (alderman) form of government should be drafted. The court requested, and received from the plaintiffs and defendants, the recommendation of three persons from which the court would choose a three-person committee to draft and recommend to the court such a form of government.[21]

The next question is choice of council size and apportionment. The court could revert to the plan which was in effect when Mobile adopted the commission plan, or it could utilize Alabama Code Title 37, Sec. 426 (1940 Supp. 1973).

The pre-1911 plan consisted of a fifteen member council with seven elected at-large and eight from single-member districts. To have this many of the council elected from at-large will tend to perpetuate the multi-member districting which the court has found unconstitutional.

The present provisions of Sec. 426 allow Mobile to adopt one of several type plans. The overwhelming evidence in the case established that the type of plan provided is what is commonly known as "weak mayor-council" type plan and is undesirable. There are also problems with three of the four plans which provide for at-large elections, the evil the court has found to exist in the present form of the city government.

The court requested the plaintiffs and defendants to draft and present to the court proposed single-member districts for councilmen under a mayor-council plan. The plaintiffs presented to the court a nine single-member district plan. The defendants chose not to avail themselves of this opportunity. A nine member plan has previously been adopted in part in two of Alabama's largest cities, Birmingham and Montgomery.

The next city election is scheduled for August, 1977. The court finds it would not be in the public interest to shorten the terms of present commissioners.

It is therefore ORDERED, ADJUDGED, and DECREED that there shall be elected in the August, 1977 municipal election, a mayor elected at-large and nine council members elected from nine single-member districts.

The plaintiffs' claims for attorneys' fees and costs will be determined after a hearing on these issues.

The court recognizes that the ordering of the change of the city form of government has raised serious constitutional issues. Reasonable persons can reasonably differ. The only remaining duties to be performed in this court are the approval of the mayor-councilman plan with relation to their duties, its implementation, and the approval of a nine single-member district plan. It is the court's judgment that this decree this date is a final judgment and decree from which an appeal may be taken. However, in the event it is not a final decree, the court *ex mero motu* pursuant to 28 U.S.C. § 1292(b) finds that the order herein entered involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of this litigation and grants the right to either party to take an immediate appeal.

It is the court's desire that if this order is appealed, such an appeal be taken promptly in order to provide the appellate courts with an opportunity to review, and, if possible, render a ruling prior to the campaign and election for the city government offices as scheduled for August, 1977.

Pending further orders, the court retains jurisdiction of this action to secure compli-

---

elected by one political party from a city to vote as a bloc.

(9) It would tend to guarantee an individual point of view if all senators are not elected as a team.

(10) It would equalize the power of people in single senate districts with the people in the

broken down multi-senate districts to *influence* the *election* of *only one* senator.

[372 F.Supp. at 391 (footnote omitted) (emphasis in original).]"

**21.** The court has appointed this committee and has given them a target date of December 1, 1976, to make their recommendations.

ance with its decree issued contemporaneously herewith and for such other and further relief as may be equitable and just.