Peggy JAMES and Wylie C. Yelverton et al., Plaintiffs-Appellants,

v.

George C. WALLACE, Individually and as Governor of the State of Alabama, and his successors in office, Defendant-Appellee.

No. 75–1061.

United States Court of Appeals, Fifth Circuit.

June 21, 1976.

---

Morris S. Dees, Jr., Joseph J. Levin, Jr., Pamela S. Horowitz, Montgomery, Ala., for plaintiffs-appellants.

Calvin M. Whitesell, Philip S. Gidiere, Jr., Montgomery, Ala., for defendant-appellee.

Before TUTTLE, THORNBERRY and TJOFLAT, Circuit Judges.

THORNBERRY, Circuit Judge:

Plaintiffs in this class action charge George C. Wallace, Governor of Alabama from 1963 to 1967 and from 1971 to date, with systematic discrimination against blacks in his appointments to state boards and commissions.[1] They claim that such discrimination constitutes a violation of the United States Constitution's guarantee of equal protection of the law and seek a declaratory judgment and affirmative relief to eradicate the effects of past discrimination. Although the district court found that a constitutional claim was stated and that Governor Wallace had no immunity to the suit, it concluded that plaintiffs had failed to prove their case and held in favor of the defendant. We find that affirmance is required.

I.

The case against Governor Wallace consisted of four types of evidence. The first type, upon which plaintiffs placed greatest reliance, was a statistical comparison of the percentage of the Governor's appointments of blacks to state boards and commissions to the percentage of blacks in Alabama's population. The evidence showed that, although 23 per cent of the state's citizens are black, less than one per cent of the Governor's appointees have been black.[2] Plaintiffs also submitted evidence of statements by Governor Wallace in 1963 and 1967 relating to the desirability of segregated schools

1. Plaintiffs are individual black citizens of Alabama and the National Association for the Advancement of Colored People (NAACP), which has approximately 10,000 Alabama members. They represent the class comprised of all black citizens of Alabama who qualify and desire to serve on state boards and commissions.

2. The plaintiffs' calculations show 8 black appointees out of a total of 1556, for a percentage of 0.51%. The breakdown was as follows:

| Body | Total | Black | White |
| --- | --- | --- | --- |
| | Appointees | | |
| County Boards of Registrars | 535 | 0 | 535 |
| County Jury Commissions | 453 | 2 | 451 |
| Trustees of State Universities | 64 | 0 | 64 |
| Mental Health Board | 30 | 0 | 30 |
| Board of Corrections | 8 | 0 | 8 |
| State Board of Pensions and Security | 11 | 0 | 11 |
| Youth Services Board | 7 | 1 | 6 |
| All Others | 448 | 5 | 443 |
| | 1556 | 8 | 1548 |

Defendant takes issue with these figures, arguing that not all of these appointments may properly be attributed to Governor Wallace. For example, the County Boards of Registrars are appointed by a committee composed of the State Auditor, the Commissioner of Agriculture and Industries, and the Governor. Ala.Code T.17, § 21 (1959). Accordingly, it seems that only ⅓ of the appointees to the Boards, at most, are properly attributable to Governor Wallace. Alabama law also prescribes that the members of the Alabama Mental Health Board are to be appointed by the Governor from a group of three submitted by the Board. Ala. Code T.22, § 314 (Supp.1973). Since there was no showing that blacks have ever been nominated by the Board, there is no basis for concluding that the Governor's choice of nominees for the appointments was racially discriminatory. A similar nomination process is required with respect to appointments to the Alabama Liquified Petroleum Board, Ala.Code T.26, § 179(69b) (Supp.1973), and the Boxing and

and to the right of a businessman to refuse to serve any person for any reason. Third, it was alleged that defendant had engaged in specific instances of discrimination in appointing a white person to the Alabama Board of Corrections over a black whom Governor Wallace admitted was "highly qualified", and in removing a black from the Alabama Commission on Higher Education. Finally, plaintiffs submitted for the court's attention judicial decisions adjudicating discriminatory practices by many of the bodies at issue,[3] and evidence that Governor Wallace had refused to carry out a 1973 court order requiring the employment of black highway patrolmen.

The plaintiffs also argue that Governor Wallace's deposition is probative of his discriminatory acts. The Governor therein stated that he makes all appointments in good faith with no discriminatory intent, mostly from persons suggested to him by his advisors. These nominees are selected either from those who apply or by recommendations of persons in the affected counties, who presumably are political supporters of the Governor. Such a system is patently discriminatory, plaintiffs argue, because it is primarily subjective, because the recommendations of the Governor's advisors are largely of whites, and because the application process is informal and not known to blacks.

## II.

Our assessment of the plaintiffs' case is influenced by the fact that the alleged dis-

crimination relates neither to employment in general nor to governmental functions which are devoid of political or policymaking content. It involves instead the exercise of a discretionary power, allocated by Alabama law to the chief elected official of the state, with substantial policymaking importance. The significance of this distinction was given clear recognition by the Supreme Court in its 1974 decision in *Mayor of City of Philadelphia v. Educational Equality League*:

> [T]o the degree that the principles cited by the Mayor reflect concern that judicial oversight of discretionary appointments may interfere with the ability of an elected official to respond to the mandate of his constituency, they are in point. There are also delicate issues of federal-state relationships underlying this case. . . [A]s recently as in *Carter v. Jury Comm'n of Greene County*, . . . [we] recognized "the problems that would be involved in a federal court's ordering the Governor of a State to exercise his discretion in a particular way . . .."

415 U.S. 605, 615, 94 S.Ct. 1323, 1330–31, 39 L.Ed.2d 630, 641–42 (1974). But although the Court viewed discretionary appointment challenges as cases in which there is a strong argument for a more circumspect approach to the problems of achieving racial equality, it did not explicitly act on its belief. Instead, the Court held in both *Carter v. Jury Comm'n of Greene County*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), and *Mayor of Philadelphia* that the plain-

---

Wrestling Commission, Ala.Code T.55, § 347 (Supp.1973).

However, even if these corrections are accepted, the situation is not significantly changed. Elimination from consideration of ⅔ of the appointments to the Boards of Registrars and all of the appointments to the Mental Health Board, Liquified Petroleum Board, and Boxing and Wrestling Commission still leaves a record of 8 appointments of black Alabamans out of 1153. The percentage is 0.69, still less than one per cent.

3. *E. g., NAACP v. Allen,* 340 F.Supp. 703 (M.D. Ala.1972) (Personnel Board); *United States v.*

*Logue,* 344 F.2d 290 (5 Cir. 1965) (Board of Registrars); *Preston v. Mandeville,* 479 F.2d 127 (5 Cir. 1973) (Jury Commission); *Marable v. Alabama Mental Health Bd.,* 297 F.Supp. 291 (M.D.Ala.1969) (Mental Health Board); *In re Applications of Alabama Educ. Television Comm'n FCC Docket No. 19430* (Aug. 22, 1973) (Educational Television Commission); *Washington v. Lee,* 263 F.Supp. 327 (M.D.Ala.1966) aff'd, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (Board of Corrections); *United States v. Frazer,* 317 F.Supp. 1079 (M.D.Ala. 1970) (Board of Pensions and Security).

tiffs had failed to prove their claims of discrimination, thereby avoiding the necessity for full explication of the proper standards in cases like the one before us.

The *Carter* case involved, among other claims, a challenge to the Governor of Alabama's appointments to the Greene County Jury Commission, one of the bodies at issue in this case. Plaintiffs showed that, although about 65 per cent of the county's population was black, no blacks had been appointed to the Commission in the twelve years prior to the suit. Despite the fact that the Commission was adjudged to have practiced illegal exclusion of blacks from juries during this period, the Supreme Court held that plaintiffs had not established a prima facie case. The Court, however, relied in part on the fact that plaintiffs' counsel had "conceded that he could not prove his charge of discriminatory selection without the testimony of the Governor." 396 U.S. at 338, 90 S.Ct. at 528, 24 L.Ed.2d at 562.

The more recent *Mayor of Philadelphia* case, despite its disparate factual setting, is closer to the case at hand. In challenging the Mayor's appointments to an Educational Nominating Panel,[4] plaintiffs in that case adduced evidence of discrimination similar to that submitted in this case. Some reliance was placed on the fact that the percentage of blacks on the Panel (15%) was well below that in the city (34%) and the public school population (60%). Plaintiffs also submitted evidence of a statement by the Mayor that he had decided in 1969 not to appoint any more blacks to the School Board, and a statement by a Deputy Mayor indicating that he was unaware of many black organizations whose leaders would qualify for appointment.

The Court found the statistical evidence utterly unconvincing.

> [T]he simplistic percentage comparisons undertaken by the Court of Appeals lack real meaning in the context of this case

. . . [T]his is not a case in which it can be assumed that all citizens are fungible for purposes of determining whether members of a particular class have been unlawfully excluded . . . [A]ssuming, *arguendo*, that percentage comparisons are meaningful in a case involving discretionary appointments, the relevant universe for comparison purposes consists of the highest ranking officers of the categories of organizations and institutions specified in the city charter, not the population at large.

415 U.S. at 620–21, 94 S.Ct. at 1333, 39 L.Ed.2d at 644. The relevance of the Mayor's statement concerning appointments to the School Board was also discounted by the Court, in view of the fact that it concerned not the Nominating Panel which was the subject of the suit but another, though related, body, and that it was made two years prior to the appointments at issue. The Court thus concluded that the proof was insufficient, and added this comment in a footnote:

> We share the view expressed in the dissent that facts in a case like the instant one, "when seen through the eyes of judges familiar with the context in which they occurred, may have special significance that is lost on those with only the printed page before them." . . . [G]reat weight should be accorded findings of fact made by district courts in cases turning on peculiarly local conditions and circumstances.

415 U.S. at 621 n. 20, 94 S.Ct. at 1333–34 n. 20, 39 L.Ed.2d at 645 n. 20.

### III.

■ The *Mayor of Philadelphia* case counsels, if not requires, affirmance of the district court here. Although plaintiffs' statistics in this care are more impressive in terms of size of sample and disparity between black representation on the bodies and black population, they suffer from the

---

4. The Panel's function was to select nominees for the Philadelphia School Board. Four of the thirteen members were appointed from the citizenry at large by the Mayor; the other nine were to be highest ranking officers of certain categories of civic organizations.

identical defect noted by the Supreme Court. Not every black person in Alabama is qualified to serve on the boards and commissions named in this action.[5] For many such bodies, there are very specialized prerequisites: members of the State Pilotage Commission, for example, must be officials of steamship companies, active bar pilots, or licensed businessmen or professionals. See Ala.Code T. 38, § 46 (Supp.1973). Other required qualifications, though not so specialized, nevertheless may be held by a different percentage of black Alabamans than their numbers in the population; one example is the common requirement that the appointee be a qualified voter, usually of some years' standing. *E. g.*, Ala.Code T. 29, § 3 (1959) (Alcoholic Beverage Control Board); *id.* T. 55, § 278 (Public Library Service); *id.* T. 55, § 296 (State Personnel Board).

■ The point is not that we assume that black citizens of Alabama do not possess the required qualifications in the numbers sufficient to establish a prima facie case; we emphatically reject such an assumption. It is simply that plaintiffs, who clearly have the burden of proof, have made no effort to show that they do. While we might not require such a showing where the qualification is subjective[6] or where statistics are virtually impossible to produce, we cannot escape the conclusion that plaintiffs in this case failed to produce the meaningful statistical comparison required by *Mayor of Philadelphia* to establish a prima facie case.

■ We find that the reasoning of the Supreme Court's decisions also undercuts the probative value of the evidence of past actions by the boards and commissions, and by Governor Wallace.[7] *Carter*'s failure to ascribe significance to the fact that the Greene County Jury Commission operated in a racially discriminatory manner indicates that the past acts of the bodies involved in this case should not be given great weight. And the recognition in *Mayor of Philadelphia* that *past* statements,[8] on related but *distinct* issues, should not form the basis of a finding of constitutional violation applies as well to the statements of Governor Wallace as to those of Mayor Tate of Philadelphia.

■ To this point, we have not departed from normal fourteenth amendment standards by reason of the special context of this case. But the fact that discretionary

---

5. Plaintiffs note that defendants stipulated to the correctness of the allegation that "the individual named plaintiffs and the class of blacks they represent throughout Alabama are black citizens who are *qualified* and desire to serve on each of the boards, commissions, and authorities. . . ." (emphasis added). This stipulation, however, admits only that there are *some* number of Alabama blacks qualified for each post; it does not establish that the percentage of Alabamans qualified for each post who are black is the same as the percentage of blacks in the general population.

6. An example of such a qualification is the requirement that members of jury commissions be "persons reputed for their fairness, impartiality, integrity and good judgment." Ala. Code T. 30, § 9 (Supp.1973).

7. Plaintiffs' claim that Governor Wallace discriminated in the removal of a black, Robert Nesbitt, is based solely on the fact that defendant stipulated to the correctness of paragraph 7(a) of the "original and amended complaint." The charge of discrimination was made only in the amended complaint, and defendant claims that its stipulation was directed only to the original

complaint. This is backed up by the specific denial of discriminatory removal of Nesbitt in defendant's answer. Since stipulations are effective only when they are the product of mutual assent, *United States v. Three Winchester 30–30 Cal. Lever Action Carbines*, 504 F.2d 1288 (7 Cir. 1974), we would be reluctant to accept the claim as true even if it had significant probative value for purposes of this case. See *Brinson v. Tomlinson*, 264 F.2d 30 (5 Cir.), *cert. denied*, 361 U.S. 830, 80 S.Ct. 79, 4 L.Ed.2d 72 (1959); *Russell-Miller Milling Co. v. Todd*, 198 F.2d 166 (5 Cir. 1952).

8. Since the appointments challenged in this case date back to 1963, the 1967 statement is not one that is prior to the date of the questioned actions. But we note that, even aside from the possible effect of the statute of limitations on the challenge to those first term appointments, the relevance of this statement is lessened by the fact that Governor Wallace, as the district court found, "has, without question, changed the nature of his public utterances" pertaining to segregation.

appointments are involved does seem to us to have special significance in assessing the effect of Governor Wallace's deposition. As plaintiffs correctly argue, the selection system described by the Governor includes subjective factors and was not shown to be equally open to blacks and whites. For these reasons, it would not be enough in a typical racial discrimination case that the selections were made in good faith; a prima facie showing of discrimination would not thereby be rebutted. *Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536, 542 (1972); *Turner v. Fouche*, 396 U.S. 346, 361, 90 S.Ct. 532, 540, 24 L.Ed.2d 567, 579 (1970); *Jones v. Georgia*, 389 U.S. 24, 25, 88 S.Ct. 4, 5, 19 L.Ed.2d 25, 26 (1967).

■ But legitimate forces are at work in discretionary appointment cases that do not exist in other cases. Governor Wallace is charged with the responsibility of representing the people who elected him by espousing the policies and carrying out the programs which were the basis for his election. Appointments like many of those at issue here [9] are important parts of his efforts to do so. Indeed, in state governmental systems like those of Alabama and many other states, where other top state officials are elected independently of the governor and most board and commission members are not subject to removal by him, the governor's appointment power is a particularly important mechanism for implementation of his programs.[10] Unless he is able to place in those positions persons who are qualified not only in terms of objective qualities and skills, but by personal allegiance to the governor and philosophical agreement with the policies that he stands for, the democratic process by which the people's will is carried out will be thwarted. Of course, if the policies espoused by the governor and put into practice by his appointees violate the constitutional rights of any Alabama citizens, the courts stand ready to provide a remedy. But until that is shown to be the case, the governor must be accorded the right to use subjective criteria in selecting the persons whom he appoints to implement his policies.

Because plaintiffs failed to establish a prima facie case through statistics and other evidence, we need not determine whether or not a conclusion that Governor Wallace acted in good faith, though on a nonobjective basis, would be sufficient to rebut a prima facie showing. Our observations are made only to refute the plaintiffs' contention that the presence of subjective elements in the selection process may itself aid in the establishment of a prima facie case of discrimination in discretionary appointments.

We similarly express no opinion on the question of whether immunity, qualified or otherwise, exists for state executive officials in cases like this one. *Cf. Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Such caution is, we believe, a necessity in an area where strong competing claims of federalism and the fourteenth amendment must somehow be resolved. To future courts, faced with more particularized showings of racial discrimination, we leave the difficult legal questions that remain.

AFFIRMED.

---

9. We recognize, however, that this reasoning does not apply to all of the boards and commissions in this case. Some perform tasks which, however, important, have little or not relation to the political mandate given Governor Wallace by the people of Alabama.

10. *See, e. g.,* C. Johnson, *American State and Local Government* 134–37 (4th ed. 1965).