EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Applicant,

v.

UNIVERSITY OF PITTSBURGH,
Respondent.

Misc. No. 7653.

United States District Court,
W. D. Pennsylvania.

March 26, 1980.

Lanier E. Williams, EEOC, Philadelphia Dist., Philadelphia, Pa., for applicant.

James J. Restivo, Jr., Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for respondent.

## OPINION

SNYDER, District Judge.

Before the Court is an application of the Equal Employment Opportunity Commis-sion (EEOC) for an order to require the University of Pittsburgh (University) to comply with the subpoena duces tecum served upon it by the EEOC during its investigation of a charge of unlawful dis-crimination against female faculty employ-ees with respect to wages and conditions of employment.

### I. *Prior Procedures*

The charge filed July 6, 1977 alleged: "The University of Pittsburgh has discri-minated, and is still discriminating, against women faculty employees by pay-ing them lower monthly salaries than the ones paid to male faculty employees. Thus, the discrimination is based upon sex. Consequently, this action of the University of Pittsburgh amounts to an unlawful employment practice, and as such, is prohibited by the provisions of Title VII of the Civil Rights Act of 1964 as amended. Inasmuch as several fringe benefits are based upon or linked with salary, by paying women faculty employ-ees lower monthly salaries than the ones paid to male faculty employees, the Uni-versity of Pittsburgh is also guilty of committing an unlawful employment practice over other conditions of employ-ment. This, too, constitutes discrimina-tion based upon sex and is therefore pro-hibited by provisions of Title VII of the U.S. Civil Rights Act of 1964 as amend-ed."

This charge was prepared and signed by Margaret F. Carroll, Acting Executive Di-rector of the American Nurses' Association (ANA). Attached to the charge was an EEOC Form 151, Third Party Certification of Charge, which gave the names, address-es, and telephone numbers of some ANA members aggrieved by the allegedly dis-criminatory conduct.

On August 12, 1977, the Pittsburgh Dis-trict Office of the EEOC, pursuant to Sec-tion 706(c) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–5(c), referred the charge to the Pennsylva-nia Human Relations Commission. ANA

then requested the Commission to terminate processing the charge, and the Commission agreed to do so on August 12th. The EEOC thereupon re-assumed jurisdiction over the charge, and the University was notified on August 17, 1977. EEOC Compliance Officer, Joel Pretz, attempted to secure an early conciliation of the charge but was unable to do so. As a part of the investigation, a letter was sent to the University on June 13, 1978, requesting information; on July 12, 1978, counsel for the University informed the EEOC that it would not voluntarily produce the information and that the EEOC would have to issue a subpoena.

On August 1, 1978, a subpoena was issued, signed by the EEOC's District Director, requiring the University to produce the following:

"1. Produce a list of all assistant instructors, instructors, assistant professors, associate professors and professors in the Schools of Nursing, Pharmacy, Health Related Professions, and Social Work. For each, indicate sex, date of hire, date of termination, (if applicable), academic degree held, whether tenured or non-tenured, whether part-time or full-time, and position(s) held during the period June 1975 to present. Additionally, indicate each aforesaid employee's initial salary and present salary and length of term of annual contract of each; i. e., ten months, twelve months, etc.

2. Produce the written/printed functional job descriptions and all written/printed materials describing all duties and job/position requirements of all assistant instructors, instructors, assistant professors, associate professors, and professors in each of the aforesaid schools.

3. Produce the written/printed qualifications and requirements necessary to perform the duties of each position, occupied by assistant instructors, instructors, assistant professors, associate professors, and professors in each of the aforesaid schools.

If the records do not exist in the form requested in Item 1 above, production of the information therein requested as most substantively provides the Commission with that information will be accepted as compliance."

The University did not produce the information, but filed a petition with the EEOC seeking revocation of the subpoena on August 3, 1978. On December 22, 1978, the EEOC entered its determination that the subpoena would not be revoked and established January 15, 1979, as the date of production of documents. The University advised the EEOC that it would not comply with the determination.

## II. *This Action*

On November 19, 1979, the EEOC filed the present action with this Court seeking enforcement of the subpoena duces tecum pursuant to Section 710 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–9. Attached to the application was the affidavit of Eugene V. Nelson, EEOC District Director, relating the above facts based on his personal knowledge and review of the EEOC's investigative file, entitled "American Nurses Association v. University of Pittsburgh, Charge No. 034–771609". This Court, on the same day as the application was received, entered an order directing the University to appear on December 12, 1979, to show cause why the subpoena should not be enforced. At the University's request, this hearing was continued to provide the University an opportunity to file an answer and a reply brief. An answer and counterclaim was filed on January 16, 1980 by the University, denying that it is legally required to produce any of the evidence requested by the subpoena.

The University offered numerous defenses:

1. It alleged that ANA members were employed only by the University's School of Nursing and that the information sought was a comparison of faculty members employed in different schools, who had different education and training, different academic missions and goals, received different external funding, had different students,

program course and course loads, and in all other respects were "not interchangeable or fungible".

2. It alleged that disclosure would result in an unwarranted invasion of the privacy of the University's employees.

3. It alleged that the information would be used only to develop comparative evidence of the University's employment practices and would not further any legitimate EEOC inquiry, thus resulting in direct, immediate, substantial and irreparable harm to the University and its employees.

4. It alleged the subpoena was overly broad and requested information which could not possibly bear any relationship to the subject of the charge filed with the EEOC and, thus, that the EEOC lacked standing to investigate any schools other than the School of Nursing, or to investigate alleged sex discrimination against female faculty members of any school other than the School of Nursing.

5. It also set forth that the subpoena would require the University to prepare compilations of data and perform other research which could not legally be demanded of it by the EEOC, and which would be unduly burdensome.

By way of counterclaim, the University sought, in addition to an order dismissing the EEOC's application, a declaratory judgment under 28 U.S.C. §§ 2201–2202 that the EEOC regulations with respect to disclosure of information obtained during an investigation were void and unenforceable, based on Section 709(e) of Title VII, 42 U.S.C. § 2000e–8(e), prohibiting any EEOC employee, under pain of criminal penalty, from making public any information obtained during the course of an investigation, and that the EEOC, in compliance with its own regulations (29 C.F.R. § 1601.22), discloses information obtained in investigations to certain persons as a matter of course, including charging parties, witnesses and their attorneys. The University claimed that such regulations directly controvert the purposes of the statute, thwarting encouragement of voluntary compliance by stimulating the filing of private actions at the same time that conciliation efforts are occurring, and that disclosure to such persons is tantamount to disclosure to the public at large.

By agreement of counsel, the show cause hearing was held February 6, 1980, and the parties were given full opportunity at that time to present all available evidence.

### III. Discussion

#### A. The Power to Issue the Subpoena

The EEOC is authorized by statute at 42 U.S.C. § 2000e–5(b) to conduct investigations to determine if an employer, such as the University, is committing employment discrimination in violation of Title VII.

A charge may be filed with the EEOC "by or on behalf of a person" allegedly aggrieved by unlawful employment practices. The EEOC has implemented this Section through procedural regulations, 29 C.F.R. § 1601.7, providing that when the charge is on behalf of an aggrieved individual, the person making the charge give to the EEOC the names, addresses and telephone numbers of persons on whose behalf the charge is being made. Thereafter, the EEOC Compliance Officers are to verify the authorization of such charge. Here, the charging party has satisfied the requirements of this Section with respect to more than 20 allegedly aggrieved persons.

Title VII, Section 709(a), 42 U.S.C. § 2000e–8(a), grants to the EEOC and its representatives "access to, for the purposes of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by this subchapter and is relevant to the charge under investigation."

In addition, the provisions of 29 U.S.C. § 161 are made applicable to EEOC proceedings under Section 710, 42 U.S.C. § 2000e–9, and this authorizes the EEOC to require attendance and testimony at its hearings, provides for a petition to revoke the subpoena, and grants the Federal district courts jurisdiction to enforce EEOC subpoenas. 42 U.S.C. § 2000e–5(f)(2); 29 U.S.C. § 161(2).

■ The University does not seriously dispute that the subpoena here was properly issued, and we so find.

### B. *The Scope of the Subpoena*

■ Both parties concede that administrative subpoenas may be judicially enforced, provided three tests are met: (1) the investigation is within the authority of the agency, (2) the subpoena is not too indefinite, and (3) the information sought is relevant to the charge under investigation. *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964) (an Internal Revenue Service summons); *United States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401, 415–16 (1950) (a Federal Trade Commission order requiring the filing of reports). Since subpoena enforcement proceedings are summary in nature, this Court is not called upon to decide the issues before the administrative agency for determination, nor are we called upon to determine whether probable cause exists to believe that the University has violated the law. *United States v. Powell, supra; Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946); *EEOC v. Chrysler Corp.*, 567 F.2d 754 (8th Cir. 1977); *EEOC v. Quick Shop Markets, Inc.*, 526 F.2d 802 (8th Cir. 1975).

Here, the EEOC is investigating a Title VII charge which is within its Congressionally mandated authority. *EEOC v. Western Publishing Co.*, 502 F.2d 599 (8th Cir. 1974); *Parliament House Motor Hotel v. EEOC*, 444 F.2d 1335, 1340 (5th Cir. 1971); *Blue Bell Boots Inc. v. EEOC*, 418 F.2d 355, 358 (6th Cir. 1969). The first prong of the abovementioned three part test has been met.

The University does not make any contention that the subpoena is too indefinite to be enforced. As indicated previously, it requires a listing of the professors in four schools, the Schools of Nursing, Pharmacy, Health Related Professions, and Social Work, indicating sex, date of hiring, date of termination, academic degrees, initial salary, present salary, and contracts of each. It requires production of functional job descriptions and written qualifications and requirements. Thus, the second prong of the three prong test is also met.

We come now to the serious contentions of the Respondent which will be discussed *seriatim.*

### 1. *The Competency and Relevancy of the Information*

It has been the University's consistent position that the charge being investigated by the EEOC is one involving female faculty members in the School of Nursing and that faculty salaries in other schools are irrelevant. It offered considerable testimony that the salaries of faculty members in the four schools are not comparable because: (1) the composition of the student bodies differ with respect to undergraduate, graduate, full-time, part-time, etc.; (2) the courses, programs and research followed are entirely distinct; (3) the sources of external funding are entirely different; (4) the amount of research and publications required vary; (5) subservience to accrediting bodies varies; (6) the nature of external competition for employees varies, for example, drug companies recruiting pharmacy school faculty compared to the need of hospitals for nurses; (7) the degrees held and schools attended by the faculty are different, as well as the tenure and length of service; (8) the professional representation and standing in the academic community varies; and (9) the courses, research loads and advising loads vary.

When this matter was raised with the EEOC on the petition to revoke the subpoena, the EEOC replied that salary comparisons may show that "women instructors and professors performing similar duties [as male professors] are paid lower salaries."

The EEOC Compliance Manual sets forth that the "scope of inquiry" is normally limited to:

> "[T]he relevant immediate environment, the department, or other similar organizational structure within the decision making authority of one person, where the claim of personal aggrievement arose."

EEOC Compliance Manual § 20.9, CCH EEOC Compliance Manual ¶ 769.

Here, however, the entire faculty in the School of Nursing is female and information beyond the School of Nursing may be crucial to the EEOC's determination of probable cause. *See Rich v. Martin Marietta Corp.*, 522 F.2d 333, 344 (10th Cir. 1975) (requested information on plant-wide basis was relevant since it might be crucial to establishing prima facie case).

We are cited the opinion of Judge Barron P. McCune of this Court in *Hopewell v. University of Pittsburgh*, 79 F.R.D. 689, 694 (W.D.Pa.1978), which rejected a comparison of non-comparable groups. In addition, the University cited several cases which have rejected comparisons of faculty jobs in one school with those of different schools. We agree with the approach in those cases. However, each case involved a finding by the court on the merits of the case that the plaintiff failed to establish the equality of one teaching position *vis-a-vis* another.

As previously noted, the Court's function in a subpoena enforcement proceeding is to determine the relevancy of the requested material. Here, the EEOC seeks salary and related information of male and female professors in the allied health schools. It is true that faculty members of different schools may not be fungible but this does not mean that the Court can rule at this point that the information is irrelevant. As noted by the EEOC in its brief "whether information pertaining to one school may aid in an investigation of another school is a matter which cannot be determined until the information is examined." We cannot take the word of the University nor does it arise from the evidence, that the statistics requested will be meaningless. In this regard, we are reminded by Judge Barrett of the Tenth Circuit in *EEOC v. University of New Mexico*, 504 F.2d 1296, 1302–03 (10th Cir. 1974), that "the broad sweep of [Title VII] is directed to the elimination of employment discrimination", and the law governing the limits on the administrative power of investigation is not so circumscribed as to prevent the enforcement of subpoenas

unless they are plainly incompetent or irrelevant to any lawful purpose. *See also EEOC v. Cambridge Tile Manufacturing Co.*, 590 F.2d 205 (6th Cir. 1979) (Notions of relevancy at investigatory stage are very broad, and so long as EEOC is not wandering into wholly unrelated areas, it has the power to subpoena documents concerning any employer practice which may shed light on discrimination charged).

We note that the charge here is not restricted to the School of Nursing, but its dimensions are University-wide. The EEOC points to the fact that they have not attempted in this subpoena to go University-wide, but only seek information relative to particular schools thought to be of comparative relevance to establish or refute a conclusion that reasonable cause exists to believe discrimination has occurred on a University-wide level, or at a lower level. We do not, at this time, pass upon the University-wide conclusion sought to be established, for that question is not before us.

### 2. *The Subject of the Charge*

■ As previously noted, the University also took the position that the Schools of Health Related Professions, Social Work and Pharmacy, which, in addition to the School of Nursing, were subjects of the subpoena request, were separate and distinct segments of the University and therefore the EEOC had no standing to seek salary information on female faculty members who were not, and could not be, represented by the ANA.

The University claims that the right of an organization to file a charge is derivative of the alleged grievance of its members. The University does not dispute the ability of the ANA to file a charge on behalf of persons "claiming to be aggrieved", but they would limit the effect of the charge to the School of Nursing faculty which, incidentally, are all females.

It is true, for example, that a complainant's charge of race discrimination does not permit the EEOC to investigate sex discrimination. *King v. Georgia Power Co.*, 295 F.Supp. 943 (N.D.Ga.1968), *aff'd* 412

F.2d 462 (5th Cir. 1969). But this does not mean that the ANA cannot challenge activity which affects its members by a University-wide policy. This is not a situation as revealed in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), where the Club failed to allege that its members were adversely affected by the proposed action. Even in the *Sierra* case, the court recognized that an organization whose members are injured may represent those members in a proceeding for judicial review. The nurses here are allegedly injured by the University-wide policy and the EEOC is conducting the investigation thereon. Therefore, there is no substance to the claim that the EEOC lacks standing to inquire into comparative salaries of other schools, so that the subpoena would be in excess of its statutory authority.

### 3. *Burdensomeness*

The University raises, but does not strongly argue, that it has no lists or other compilations containing all of the requested data and, therefore, the EEOC requirements would be burdensome to it. It offered no evidence that an excessive burden would be imposed in light of the restriction of the subpoena to the four schools. Furthermore, it is noted that Item 1 of the subpoena states that if the information is not in existence, production of the requested information "as most substantively provides the Commission with that information will be accepted as compliance."

■ Even if production of evidence imposes some burden, we believe that so long as the information requested is relevant and material, the cost is "part of the social burden" of our present day society, *see Bradley Lumber Co. v. NLRB*, 84 F.2d 97 (5th Cir. 1936), and may include the compilation of lists prepared from existing records. *New Orleans Public Service, Inc. v. Brown*, 507 F.2d 160 (5th Cir. 1975). *Cf. NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969).

### 4. *The Confidentiality and Privilege of the Information Sought*

The University takes the position that the EEOC seeks salary and other data which goes to the heart of the relationships with its faculty members in four different schools. They claim that disclosure would do irreparable harm to the University while providing no tangible benefit to the EEOC.

■ While the information may be extremely important to the University, this argument was not accepted by Judge Barrett in *EEOC v. University of New Mexico, supra*, where he cogently reasoned that an invocation of the Fourth Amendment prohibition against unreasonable searches and seizures, predicated on the basic proposition that faculty personnel files are confidential, could not be sustained in light of the proscription contained in the statute against public disclosure, in any matter, of information obtained in the course of investigation (42 U.S.C. § 2000e–8(e)). *Cf. Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973) (denying a taxpayer's Fifth Amendment claim of privilege in an Internal Revenue investigation based upon the expectation of privacy of records delivered to his accountant for the purpose of preparing his income tax return). Thus, although the information sought may be confidential, this is not a basis for denying enforcement of the subpoena.

### C. *The Counterclaim*

By way of counterclaim, the University seeks a declaratory judgment and an injunction that regulations promulgated by the EEOC permitting disclosure of information obtained during the course of an investigation are void and unenforceable, and seeks an injunction against disclosing any information obtained in this investigation to *any person*. As noted, Section 709(e) of Title VII, 42 U.S.C. § 2000e–8(e), prohibits any employee of the EEOC, under pain of criminal penalty, from making public any information obtained during the course of any EEOC investigation. Regulations promulgated by EEOC at 29 C.F.R. §§ 1601.22 and 1610.17(d), as implemented in the spe-

cial disclosure rules of the EEOC Compliance Manual, authorize the EEOC to release information obtained during its investigations to "charging parties, or their attorneys, respondents or their attorneys or witnesses where disclosure is deemed necessary for securing appropriate relief."

Our investigation reveals that the restrictions upon disclosure by EEOC of investigative information contained in §§ 2000e–5(b) and 2000e–8(e) and their effect upon the validity of EEOC's Regulations and Compliance Manual have been considered by four Courts of Appeals with conflicting conclusions. The Fifth Circuit in *H. Kessler & Co. v. EEOC*, 472 F.2d 1147 (5th Cir.) (en banc) *cert. denied* 412 U.S. 939, 93 S.Ct. 2774, 37 L.Ed.2d 398 (1973), held that charging parties and their attorneys are not members of the "public" within the meaning of the restrictive statutory language and consequently the Regulations and the Compliance Manual do not exceed the statute and thus are valid and enforceable. The District of Columbia Circuit in *Sears, Roebuck & Co. v. EEOC*, 581 F.2d 941 (D.C.Cir.1978), the Seventh Circuit in *Burlington Northern, Inc. v. EEOC*, 582 F.2d 1097 (7th Cir. 1978), *cert. denied* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979), and the Fourth Circuit in *EEOC v. Joseph Horne Co.*, 607 F.2d 1075 (4th Cir. 1979), reached the opposite conclusion. The Third Circuit has not considered this problem.

The analysis of the legal arguments, the legislative history and the policy considerations on both sides of the question are fully developed in *Kessler, Sears, Burlington*, and *Horne*: further argument will accomplish little.

In our opinion, the statutory scheme of enforcing Title VII is consistent with the position taken under 29 C.F.R. § 1610.17(d), that individual charging parties are not members of the public within the meaning of Section 709(e). We will therefore direct that the EEOC shall make no disclosure of the investigative material except in accordance with the above cited regulations. The subpoena subject to the protective order as above indicated, will be enforced.

An appropriate order will be entered.